**ORAL ARGUMENT NOT YET SCHEDULED**

IN THE

# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 25-5028

◆━━◆◆◆━━◆

HAMPTON DELLINGER, IN HIS PERSONAL CAPACITY AND IN HIS OFFICIAL
CAPACITY AS SPECIAL COUNSEL OF THE OFFICE OF SPECIAL COUNSEL,

*Plaintiff-Appellee,*

—v.—

SCOTT BESSENT, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE
TREASURY, ET AL.,

*Defendants-Appellants.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

## APPELLEE'S OPPOSITION TO APPELLANTS'
## EMERGENCY MOTION FOR A STAY PENDING APPEAL

---

JOSHUA MATZ
   *Counsel of Record*
JACKSON ERPENBACH
BENJAMIN STERN
HECKER FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
(202) 742-2661
jmatz@heckerfink.com

KATE DONIGER
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883

*Counsel for Plaintiff-Appellee
Hampton Dellinger*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.     Parties and Amici

Plaintiff-Appellee is Hampton Dellinger, in his personal capacity and in his official capacity as Special Counsel of the Office of Special Counsel. Defendants-Appellants are Scott Bessent, in his official capacity as Secretary of the Treasury; Sergio Gor, in his official capacity as Director of the White House Presidential Personnel Office; Karen Gorman in her official capacity as Principal Deputy Special Counsel and, upon the purported removal of the Special Counsel, the Acting Special Counsel of the Office of Special Counsel; Karl Kammann, in his official capacity as the Chief Operating Officer of the Office of Special Counsel; Donald J. Trump, in his official capacity as President of the United States of America; and Russell Vought, in his official capacity as Director of the Office of Management and Budget.

No amici curiae or intervenors participated before the district court.

### B.     Rulings Under Review

The ruling under review is a temporary restraining order issued by the district court, the Honorable Amy Berman Jackson presiding, on February 12, 2025. ECF 14.

### C.     Related Cases

This case has previously been before this Court as No. 25-5025. Counsel for Plaintiff-Appellee is not aware of any related cases.

Dated: February 13, 2025                    /s/ Joshua A. Matz

                                            Joshua A. Matz
                                            *Counsel for Plaintiff-Appellee*

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

STATEMENT ........................................................................................................1

    I.     The United States Office of Special Counsel.......................................2

       A. The Founding and Mission of the OSC................................................2

       B. The OSC's Jurisdiction and Functions.................................................5

    II.    Procedural History...............................................................................7

ARGUMENT ........................................................................................................9

    I.     The Court Should Deny a Stay Pending Appeal Because
         It Lacks Jurisdiction Over this Appeal..................................................9

       A. The Court Lacks Appellate Jurisdiction..............................................9

       B. An Exercise of Mandamus Jurisdiction Is Unwarranted ...................13

    II.    Defendants Fail to Establish Their Entitlement to
         Extraordinary Relief............................................................................14

       A. Defendants Are Not Substantially Likely to Prevail on the Merits ....14

       B. Defendants Fail to Establish Irreparable Harm Absent Relief...........20

       C. The Remaining Equitable Factors Cut Against Defendants ...............20

CONCLUSION ....................................................................................................24

## INTRODUCTION

For the second time in three days, Defendants seek emergency appellate relief from a temporary order meant to preserve the *status quo ante* while the district court more fully considers the issues and assesses whether to issue an appealable preliminary injunction. This Court denied Defendants' first request, concluding that the district court's administrative stay was not appealable under 28 U.S.C. § 1292(a)(1) and that Defendants had failed to justify the extreme remedy of mandamus jurisdiction. *See* Order, No. 25-5025 (D.C. Cir. Feb. 12, 2025). The Court should deny this second request, too. Defendants again fail to carry their burden of demonstrating appellate jurisdiction, and their arguments for an emergency stay remain meritless. Moreover, it would be disruptive of sound judicial process—and destabilizing of fundamental procedural requirements—for the Court to now accept Defendants' apparent view (as expressed here and in other pending cases) that any TRO implicating their expansive vision of Article II prerogatives is necessarily immediately appealable.

## STATEMENT

After President Trump purported to terminate Special Counsel Hampton Dellinger from his Senate-confirmed role at the Office of Special Counsel (OSC)—in violation of a statute conferring for-cause removal protections—Special Counsel

1

Dellinger filed suit and sought a TRO to immediately preserve the *status quo ante*. The district court granted such relief and Defendants now seek an emergency stay.

Before turning to the jurisdictional defects in Defendants' position (and to an analysis of the traditional stay factors), we first provide context concerning the role of the OSC, the history of its statutory for-cause removal protection (which reflects a considered inter-branch settlement), and the proceedings that led to this point.

## I.    THE UNITED STATES OFFICE OF SPECIAL COUNSEL

### A. The Founding and Mission of the OSC

The Office of Special Counsel is an independent federal agency, originally established by the Civil Service Reform Act of 1978 (CSRA). *See* 5 U.S.C. § 1211(a). The CSRA began with President Carter, who recommended creating a Special Counsel, "appointed by the President and confirmed by the Senate" to investigate and prosecute abuses of civil service laws, and the Merit Systems Protection Board (MSPB), a nonpartisan board removable only for cause to adjudicate those disputes. *See* Federal Civil Service Reform Message to the Congress (Mar. 2, 1978). This structure, President Carter explained, would "guarantee independent and impartial protection to employees" and thereby "safeguard the rights of Federal employees who 'blow the whistle.'" *Id.*

Congress accepted President Carter's proposal, including the MSPB and the Special Counsel with for-cause removal protections. *See* S. 2640, 95th Cong. (Mar. 3, 1978); H.R. Rep. 95-1403, at 388 (1978) (supp. views of Rep. Solarz). Congress made an express finding that the "authority and power of the Special Counsel" was required to "investigate allegations involving prohibited personnel practices and reprisals against Federal employees." Civil Service Reform Act of 1978, § 3(4), Pub. L. No. 95–454, 92 Stat. 1112. Consistent with this vision, Congress provided that the Special Counsel could be removed "by the President only for inefficiency, neglect of duty, or malfeasance in office." Civil Service Reform Act of 1978, § 1204. This drew an initial objection from the U.S. Department of Justice Office of Legal Counsel (OLC), which President Carter effectively overruled when he subsequently signed the law, declaring it would create "a new system of excellence and accountability." *Compare Memorandum Opinion for the General Counsel, Civil Service Commission*, 2 Op. O.L.C. 120 (1978), *with President Jimmy Carter Remarks on Signing the Civil Service Reform Act of 1978 into Law* (Oct. 13, 1978).

In 1988, Congress again grew concerned that federal whistleblowers were not adequately protected, and crafted the Whistleblower Protection Act to "strengthen and improve protection for the rights of Federal employees, to prevent reprisals, and to help eliminate wrongdoing within the Government." § 2(b), Pub. L. No. 101–12,

103 Stat. 16. President Reagan, however, pocket vetoed this legislation, objecting to several new authorities that the legislation would vest in the OSC—most notably including the authority to seek judicial review of adverse MSPB decisions in federal court, which would "permit[] the Executive branch to litigate against itself." Memorandum of Disapproval on a Bill Concerning Whistleblower Protection (Oct. 26, 1988). President Reagan also suggested hesitancy about the bill's for-cause removal protections, which were identical to those already in effect. *Id.*

After the pocket veto, Congress worked closely with Presidents Reagan and Bush to address their separation-of-powers concerns. Because of these negotiations, the revised bill—the enacted Whistleblower Protection Act of 1989—no longer authorized the OSC to pursue litigation against other agencies in federal court. *See* 135 Cong. Rec. 5012, 5039 (Mar. 21, 1989) (statement of Rep. Parris).

But those negotiations did not displace the OSC's status as an independent agency or its existing for-cause removal provision. As the Subcommittee on Civil Service emphasized, federal employees required "assurance that the Office of Special Counsel is a safe haven," because otherwise it "can never be effective in protecting victims of prohibited personnel practices." 135 Cong. Rec. 5012, 5034 (Mar. 21, 1989) (Joint Explanatory Statement); *see also* 135 Cong. Rec. 5012, 5032 (Mar. 21, 1989) (statement of Rep. Sikorski). President Bush's Attorney General

4

endorsed the bill and "pledged" to lobby for the Act. *See* Letter from Attorney General to Sen. Levin dated Mar. 3, 1989, 135 Cong. Rec. 5012, 5033-34.

Ultimately, President Bush agreed that the revisions had "addressed" the "constitutional concerns" he and President Reagan had raised about the Act. *See* George H.W. Bush, Remarks on Signing the Whistleblower Protection Act of 1989 (Apr. 10, 1989). In signing the Act, he specifically emphasized that the Act would "enhance the authority of the Office of Special Counsel to protect whistle-blowers," and that it "retain[ed] current law which provides that the Special Counsel may only be removed for inefficiency, neglect of duty, or malfeasance." *Id.*

### B.    The OSC's Jurisdiction and Functions

As Congress and two Presidents contemplated, the OSC maintains a unique and independent position to protect federal employees from prohibited personnel practices (PPPs), especially reprisal for whistleblowing. The OSC also affords a secure channel for employees to blow the whistle on wrongdoing. It civilly enforces the Hatch Act. And it assists Congress' legislative and oversight agendas.

Significantly, none of the OSC's authorities regulate or penalize private activity. Instead, as an "ombudsman" and "watchdog," *Frazier v. Merit Sys. Prot. Bd.*, 672 F.2d 150, 162-63 (D.C. Cir. 1982), the OSC has "only limited jurisdiction to enforce certain rules governing Federal Government employers and employees,"

*Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 221 (2020). Even as to federal employees, the OSC does not impose any discipline or other adverse action directly. Instead, the OSC receives allegations of PPPs, assesses and investigates such complaints, and decides on a proper course of action. *See* 5 U.S.C. § 1212(a). Where the OSC sees reasonable grounds to find a PPP, it first works with the relevant agency head to ensure corrective action is taken voluntarily and the PPP victim receives relief. Absent voluntary settlement, the OSC may petition the MSPB on the injured employee's behalf, *id.* § 1214, which an employee may also do in their own right, *id.* § 1221. In addition, the OSC can file a complaint with the MSPB asking that a perpetrator of a PPP be disciplined. *See id.* § 1215. The Special Counsel also has authority to investigate and seek remedies for violations of the Hatch Act, and to issue nonbinding advisory opinions concerning that Act. *See id.* §§ 1212(f), 1216. The OSC exercises no authority over the MSPB, whose decisions are subject to judicial review, *id.* §§ 1214(c)(2), 1215(a)(4), 7703(b). The OSC cannot proceed directly in any Article III court (except as an *amicus curiae*). *See id.* § 1212(h).

Beyond its HR investigative role, the Whistleblower Protection Act authorizes the OSC to receive reports from employee-whistleblowers within agencies. *See* 5 U.S.C. § 1213(a). However, if a report appears credible, the OSC cannot conduct its own investigation: it reviews the investigation conducted by the whistleblower's

agency, and then only reports the investigation and the OSC's own assessment to Congress and the President. *See id.* §§ 1212(a)(3), 1213(c)-(e). The Special Counsel must keep the identity of any whistleblower strictly confidential. *Id.* § 1213(h).

Finally, Congress has delegated to the OSC functions that are best described as quasi-legislative in nature. Virtually every action taken by the OSC—from receipt of allegations, to agreed corrective actions, to complaints in the MSPB—must be reported to Congress to inform legislative functions, including oversight and legislation. *See id.* § 1217; *see also id.* § 1218 (reporting to the President).

## II.    PROCEDURAL HISTORY

Plaintiff Hampton Dellinger has served as Special Counsel since March 6, 2024, following his nomination by the President and confirmation by the Senate to a five-year term. On February 7, 2025, Special Counsel Dellinger received an email from Sergio Gor, Assistant to the President and Director of the White House Presidential Personnel Office, that purported to remove him from office. That email stated: "On behalf of President Donald J. Trump, I am writing to inform you that your position as Special Counsel of the US Office of Special Counsel is terminated, effective immediately. Thank you for your service." Ex. A to Compl., ECF 1-1.

On Monday morning, February 10, 2025, Special Counsel Dellinger filed a complaint and simultaneously sought a TRO to preserve the *status quo ante* pending

7

further proceedings. That afternoon, the district court held an in-person hearing. The district court proposed that Defendants "extend the effective date of the President's proposed action while [the parties] brief [the motion]," but Defendants refused that proposal. Feb. 10, 2025 Tr. ("Tr.") 3:1-18, ECF 9. Defendants then requested leave to file an opposition the next day to Special Counsel Dellinger's TRO application. Tr. 27:23-24. The district court agreed, noting that it might issue an administrative stay to preserve the *status quo* while it decided TRO application. *Id.* 25:8-11, 25:17-20. That evening, the district court issued a three-day administrative stay, ordering that Special Counsel Dellinger be allowed to continue to serve in his position through midnight on February 13, 2025. *See* Minute Order, 8:20 PM, Feb. 10, 2025.

The very next morning (February 11), Defendants filed in this Court a motion for an emergency stay pending appeal. No. 25-5025, Doc. No. 2099980. One day later (February 12), Special Counsel Dellinger filed a response. Doc. 7. That same night, this Court denied Defendants' motion and dismissed their appeal, holding unanimously that the Court lacked jurisdiction and that Defendants were not entitled to mandamus relief. *See* Order, No. 25-5025 (D.C. Cir. Feb. 12, 2025) (Katsas, Childs, Pan, JJ.). Judge Katsas issued a concurring opinion. *See id.* at 3.

Several hours after this Court denied Defendants' stay application, the district court granted Special Counsel Dellinger's TRO application. ECF 14 ("TRO") at 26.

8

Consistent with the Federal Rules of Civil Procedure, the district court limited its TRO to a 14-day period and scheduled a hearing on February 26 to decide whether to issue "an appealable preliminary injunction." *Id.* at 27. Defendants responded to that order by filing a notice of appeal and this second emergency stay application. They also filed a second stay application below, which the district court denied in an opinion that makes clear its commitment to a responsible, expedient resolution of the case. For the Court's reference, that opinion is attached as Exhibit A to this brief.

## ARGUMENT

## I.  THE COURT SHOULD DENY A STAY PENDING APPEAL BECAUSE IT LACKS JURISDICTION OVER THIS APPEAL

Defendants' second emergency motion should be denied because, as with the first such motion, the Court lacks authority to consider the appeal.

### A.  The Court Lacks Appellate Jurisdiction

Under 28 U.S.C. § 1292(a)(1), courts of appeals have jurisdiction of appeals from "interlocutory orders of the district courts . . . granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions." By virtue of this textual restriction to "injunctions," the "general rule is that orders granting, refusing, modifying, or dissolving temporary restraining orders are not appealable under § 1292(a)(1)." 16 *Fed. Prac. & Proc. Juris.* § 3922.1 (3d ed.); Mot. 8 ("TROs are ordinarily not appealable."). That principle controls the result here: the

9

district court issued a TRO that by its terms expires when the court "rules on the entry of a preliminary injunction," and that sets "a hearing on plaintiff's request for an injunction pending resolution of the case on the merits, i.e., an appealable preliminary injunction, on February 26, at 10:00 a.m." ECF 14, at 26-27. The order clearly contemplates that the district court will decide whether to issue a preliminary injunction at that juncture, at which point its decision will be properly appealable.

Defendants nonetheless assert that the TRO should be treated as though it were a preliminary injunction. Mot. 8-10. But the TRO requires only the temporary preservation of the *status quo ante* before the unlawful termination of Special Counsel Dellinger. *See Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014) (explaining that the relevant status quo "is the last actual, peaceable uncontested status which preceded the pending controversy" (citation omitted)). This short-lived order does not bear the central hallmark of a preliminary injunction—namely, that it is "of indefinite duration extending during the litigation." *U.S. Dep't of Lab. v. Wolf Run Mining Co., Inc.*, 452 F.3d 275, 281 n.1 (4th Cir. 2006).

In seeking to overcome that obstacle, Defendants claim that the TRO should be deemed appealable because it reinstates "the principal officer of a single-headed agency after the President's removal of the officer." Mot. 8. But this Court already rejected that very same rationale in denying Defendants' first emergency motion.

10

Moreover, the concerns that Defendants raise remain emphatically "abstract," rather than presenting "concrete, immediate, irreversible consequences." Order, No. 25-5025 (D.C. Cir. Feb. 12, 2025) (Katsas, J., concurring). As the district court found, "there are no facts to suggest that an order maintaining Dellinger in the role he occupied for the past year would have a 'disruptive' effect on any administrative process; if anything, it would be his removal that is disruptive." TRO at 18-19; *see also id.* at 25 (noting that Defendants "proffer no circumstances that . . . would justify the immediate ejection of the Senate-confirmed Special Counsel while the legal issue is subject to calm and thorough deliberation"). Indeed, Defendants cite no "cause" for the Special Counsel's dismissal, and have not identified any action or inaction on the Special Counsel's part—or any other conduct by anyone else—that supports their hurried, overnight demand for a departure from settled procedures.

Moreover, Defendants' argument for treating the TRO as equivalent to a full preliminary injunction rests on doubtful premises. They insist that this TRO works an extraordinary separation of powers injury—one so extreme and pressing as to overcome the jurisdictional barrier created by § 1292(a)(1). But as the district court noted, everything about the statutory structure at issue reflects a choice by Congress (endorsed by two Presidents) to prioritize independence over presidential solicitude in the OSC. Temporary continued adherence to the OSC's statutory scheme, which

11

has been upheld by presidents for half a century, is hardly a five-alarm fire. *See* TRO at 25-26 ("Defendants have identified no impending injury or alleged constitutional error that cannot be fixed in the future that would outweigh the harm that will flow from the precise circumstance Congress deliberately chose to prohibit.").

Finally, Defendants suggest that the district court engaged in gamesmanship by styling its order as a TRO. That is uncharitable and untrue. Special Counsel Dellinger was terminated last Friday. The district court received a TRO application on Monday, promptly held a short hearing where Defendants were not prepared, received an opposition brief from Defendants on Tuesday, and issued an order on Wednesday. It was perfectly sound for the district court to style that quickly written order as a TRO, and to provide that it will more carefully study the issues and hold an additional hearing before ruling on the more durable relief inherent to an appealable preliminary injunction. This approach to the issues is standard judicial practice and expressly contemplated by the governing procedural framework; it is also quite prudent given the gravity of the issues presented here. *See, e.g.*, *Nutrasweet Co. v. Vit-Mar Enters., Inc.*, 112 F.3d 689, 692 (3d Cir. 1997). To hold otherwise would invite a flood of emergency appeals—in this Circuit and others— wherein DOJ lawyers insist that any TRO infringing on abstract Article II

12

prerogatives is an emergency requiring immediate relief. That would be imprudent, particularly given the nature and extent of active TRO litigation at this moment.

Accordingly, the Court lacks jurisdiction over this appeal and should deny a stay pending appeal. *See Off. of Pers. Mgmt. v. Am. Fed'n of Gov't Emps., AFL-CIO*, 473 U.S. 1301, 1306 (1985) (Burger, C.J., in chambers) (articulating that principle).

## B.    An Exercise of Mandamus Jurisdiction Is Unwarranted

Defendants' alternative, briefly sketched claim that this Court should exercise mandamus jurisdiction fares no better. Mandamus "is a drastic and extraordinary remedy reserved for really extraordinary causes," *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380 (2004), and this Court regularly rejects such requests, *see In re Garland*, No. 23-5154, 2023 WL 5662104, at *1 (D.C. Cir. Sept. 1, 2023). It should do so again here. Defendants' invocation of "the President's authority under Article II to exercise the entire Executive power of the United States," as well as the need "to protect our constitutional structure by safeguarding the President's prerogative against intrusion by the Judicial Branch," Mot. 10, merely repeat the same refrains as their unsuccessful effort to seek relief from the administrative stay that similarly restored the *status quo ante*. Defendants cannot explain why those abstract harms suddenly require extraordinary mandamus relief from an order that lasts merely two

13

weeks. And, as described below, Defendants err by claiming that their right to violate the for-cause removal statute is "clear and indisputable." *Cheney*, 542 U.S. at 381.

## II.    DEFENDANTS FAIL TO ESTABLISH THEIR ENTITLEMENT TO EXTRAORDINARY RELIEF

For the reasons given above, the Court should deny Defendants' motion based on lack of jurisdiction. Defendants' request also cannot satisfy the stay factors.

### A. Defendants Are Not Substantially Likely to Prevail on the Merits

Special Counsel Dellinger is substantially likely to prevail on his claims, all of which rest on the premise that he has been unlawfully removed from office in violation of his statutory for-cause removal protection. *See* 5 U.S.C. § 1211(b). Defendants' sole merits argument is that this statutory protection is unconstitutional. But Section 1211(b) comports with the separation of powers and applicable Supreme Court precedents. *See* TRO at 9 ("[T]o date, the Supreme Court has taken pains to carve the OSC out of its pronouncements concerning the President's broad authority to remove officials who assist him in discharging his duties at will."). Moreover, the application of a for-cause removal rule to the OSC advances core statutory purposes, reflects a considered inter-branch agreement, and poses no harm to Article II.

The Supreme Court's original pronouncement on this issue is *Humphrey's Executor v. United States*, which upheld the constitutionality of a materially identical restriction on the President's authority to remove members of the Federal Trade

14

Commission (FTC). 295 U.S. 602, 625-26, 629 (1935). There, the Supreme Court explained that Congress had created the FTC as an independent agency—and that the FTC held not only executive authorities, but also "specified duties as a legislative or as a judicial aid" that distinguished it from being "an arm or an eye of the executive." *Id.* at 628. For example, the FTC was required to "mak[e] investigations and reports thereon for the information of Congress . . . in aid of the legislative power," in which function it "acts as a legislative agency." *Id.* Because of the FTC's quasi-legislative and quasi-judicial roles, the Supreme Court concluded that Congress could appropriately impose for-cause limits against presidential removal. More broadly, the Supreme Court recognized in *Humphrey's Executor* that Congress could shield agency heads from removal without cause where Congress deemed such protections necessary to secure a proper measure of impartiality, expertise, and independence. That ruling forms the basis for a substantial part of the modern federal government. *E.g.*, *Wiener v. United States*, 357 U.S. 349, 355-56 (1958).

In recent years, the Supreme Court has weighed in against removal limits for single-headed agencies that wield substantial regulatory and enforcement authority over private actors. First came *Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U.S. 197 (2020). There, the Supreme Court noted that for-cause removal limits for single-person agency leadership structures are a relatively recent

15

phenomenon. *See id.* at 220-22. It then concluded that applying such statutory protections to the Director of the CFPB raised exceptionally grave concerns in light of the Director's broad power to "issue final regulations, oversee adjudications, set enforcement priorities, initiate prosecutions, and determine what penalties to impose on private parties." *Id.* at 225. As the Supreme Court noted, the Director's authority to "dictate and enforce policy for a vital segment of the economy affecting millions of Americans" infringed on Article II. *Id.* Accordingly, the Supreme Court held that the President must be able to remove the CFPB Director at will. *See id.* at 227-238. In reaching this conclusion, though, the Supreme Court expressly distinguished the OSC, which "exercises only limited jurisdiction to enforce certain rules governing Federal Government employers and employees" and "does not bind private parties at all or wield regulatory authority comparable to the CFPB." *Id.* at 221.

Whereas *Seila Law* distinguished removal protections at the OSC, it expressly cast into doubt such protections at the Federal Housing Finance Agency (FHFA)— which were stricken down one year later in *Collins v. Yellen*, 594 U.S. 220 (2021). In reaching this conclusion, *Collins* reasoned that asserted differences between the CFPB and FHFA regarding the "nature and breadth" of their authority were not dispositive of the constitutional analysis—adding that the FHFA was in some respects *more* powerful than the CFPB and that it had direct "regulatory and

enforcement authority over two companies that dominate the secondary mortgage market and have the power to reshape the housing sector." *Id.* at 251, 253.

As explained in more detail below, *see* ECF 2-1, *Humphrey's Executor*, *Seila Law*, and *Collins* all support the constitutionality of the OSC's removal limitation.

*First*, *Seila Law* and *Collins* were animated by a profound concern about the President's inability to remove officials exercising executive power in ways that could "dictate and enforce policy for a vital segment of the economy affecting millions of Americans." *Seila Law*, 591 U.S. at 225; *accord Collins*, 594 U.S. at 255. As the Supreme Court recognized when it distinguished the OSC in *Seila Law*, that concern is not present here. The OSC is a primarily investigative agency with limited advisory and reporting functions—all focused on human-resources issues. In performing these functions, the OSC does not regulate or penalize private activity. *See Seila Law*, 591 U.S. at 221 (noting that the OSC "does not bind private parties at all"). The OSC lacks the power to issue final regulations, oversee adjudications, commence prosecutions, determine what penalties to impose, appear in an Article III tribunal (except as an amicus), or control in any way the substantive regulatory framework for any public or private entities. While the OSC's work is essential, it occurs within a "limited jurisdiction" related to federal employers and employees. *Id.* It poses no "special threat to individual liberty" for the Special Counsel to receive

17

limited independence from direct political control in reviewing and investigating confidential whistleblower reports from federal employees. *See id.* at 223. As the district court observed, that conclusion finds further support in *Morrison v. Olson*, which upheld for-cause removal protections for a single officer with only "limited jurisdiction" over federal personnel and otherwise "lacking policymaking or significant administrative authority." 487 U.S. 654, 691-92 (1988); TRO at 11.

*Second*, consistent with the reasoning of *Humphrey's Executor*, the OSC exists to vindicate quasi-legislative functions and interests held in common by Congress, the Executive Branch, and the public. In that respect, the OSC is more than just an aspect of the executive power. *See Humphrey's Executor*, 295 U.S. at 628. Moreover, the OSC's structure—including its for-cause removal provision— reflects a heavily negotiated inter-branch resolution that was embraced by President Bush when he signed the Whistleblower Protection Act (and by his Attorney General in cooperating to pass the bill). In fact, not one, but two presidents—Carter and Bush—signed legislation with for-cause removal protections at the OSC, making clear that any interstitial concerns raised by their subordinates at OLC had either been addressed or overruled by the Office of the President. *See supra* at 2-5.

*Finally*, the need for independence at the OSC is unique in its character and purposes. With respect to the CFPB and FHFA, the case for agency independence

18

rested heavily on a substantive belief that economic regulation should be free of specific forms of presidential political control. *See Seila Law*, 591 U.S. at 207; *Collins*, 594 U.S. at 229-30. Agency independence in those settings was specifically designed to restrain the President's ability to direct the agencies' regulatory powers consistent with his agenda. Here, in contrast, the OSC lacks any regulatory powers— and the independence afforded by its statutory for-cause removal provisions serves an entirely different function. Rather than hamper the President's substantive regulatory agenda, the OSC's independence protects and assures whistleblowers. If the official charged with protecting whistleblowers from retaliation was himself utterly vulnerable to retaliation and removal for taking on politically charged or inconvenient cases, then the OSC's whistleblower protection purpose might fail when it is most needed. Simply put, Congress reasonably found—and two Presidents agreed—that the Special Counsel cannot serve as an independent watchdog, or protect whistleblowers, if he is subject at all times to removal without cause.

Defendants largely ignore all this. Instead, they point to President Biden's decision to remove the Commissioner of Social Security (and a few cases on the same point). Mot. 16, 21. But the same OLC opinion that authorized his decision regarding the Social Security Administration—an OLC opinion issued after *Seila Law* and *Collins*—expressly distinguished the OSC by virtue of its "primarily

investigatory function" and "limited jurisdiction." *Constitutionality of the Commissioner of Social Security's Tenure Protection*, 2021 WL 2981542, at *6 n.1 & *9 (O.L.C. July 8, 2021). For good reason: the OSC is indeed quite different.

Given all this, Defendants have failed to show that they are substantially likely to succeed in proving the unconstitutionality of the Special Counsel's for-cause removal protection. Thus, they have failed to prove an entitlement to relief.

### B.    Defendants Fail to Establish Irreparable Harm Absent Relief

Defendants assert that the TRO works an "extraordinary harm" to the Presidency. Mot. 22. But this confuses the merits with the irreparable harm inquiry. In any event, as explained above, Defendants invoke "abstract separation-of-powers concerns," but still do not describe any "kind of concrete, immediate, irreversible consequences," Order, No. 25-5025 (Katsas, J., concurring), that will result from Special Counsel Dellinger functioning in his Senate-confirmed role for the next two weeks that would warrant appellate intervention at this early stage.

### C.    The Remaining Equitable Factors Cut Against Defendants

Defendants assert that Special Counsel Dellinger experienced no cognizable injury when he was illegally terminated—and that he therefore can assert no equity in the outcome of this proceeding. That counterintuitive position is mistaken. And a broader assessment of the public interest cuts sharply against Defendants.

20

According to Defendants, the President can terminate any agency official with for-cause removal protections, at any time, for any reason—and the fired official cannot seek interim relief or reinstatement. If accepted, that claim would reduce for-cause removal protections to rubble: a President could fire independent officials at will and, months or years later, after final judgment and appeal, those fired officials might (at most) be able to recover some backpay from the Treasury . . . but nothing more. On that view, a century of ink and energy devoted to agency independence has largely been a misadventure, since Presidents could simply buy their way out and courts would be effectively powerless to remedy those unlawful terminations.

That position is inconsistent with precedent and common sense, and with the structure and purpose of statutory for-cause removal protections (which can inform the identification of irreparable harms here). As Special Counsel Dellinger explained below, ECF 12, at 6, and as the district court rightly concluded, TRO at 16-24, he has experienced substantial, cognizable irreparable harm by virtue of Defendants' conduct. He is also a proper party to assert the institutional equities of the OSC itself, which are substantial given the Office's need for a measure of continued political independence in light of its core confidential whistleblower protection function.

The irreparable harm to Special Counsel Dellinger in both his personal and official capacity is now even more apparent. The President has already developed a

21

track record of removing independent agency heads (whether lawfully or unlawfully) and then appointing an acting head in their place, only for the acting head to bring the agency's work to an immediate (and possibly indefinite) halt. *See, e.g.*, Stacy Cowley, *Confusion Reigns as 'a Wrecking Ball' Hits the Consumer Bureau*, N.Y. Times (Feb. 10, 2025). Earlier this week, despite the district court's order that Defendants "may not . . . recognize the authority of any other person as Special Counsel," the President purported to appoint a new Acting Special Counsel to lead the Office of Special Counsel. *See* ECF 13; TRO Order at 26 n.8. That decision directly contradicts Defendants' prior position that the OSC would continue to function as it had before because the Special Counsel would be replaced in the interim by the Acting Special Counsel, a career Principal Deputy Special Counsel. *See* Tr. at 4:2-4, 26:10-14. Now, Doug Collins—a political appointee who reports directly to the President—is somehow expected to serve as Acting Special Counsel, the Senate-confirmed Secretary of the Department of Veterans Affairs, and as the new Acting Director of the Office of Government Ethics. These actions threaten to upset the OSC's functioning at a time that its role in protecting whistleblowers is most needed. The public interest plainly favors preserving the *status quo ante*.

*    *    *    *    *

In sum, Defendants' latest emergency motion fails for the same reasons as its last one. *First*, the Court lacks jurisdiction over this appeal because the TRO is non-appealable and Defendants do not come close to establishing a right to mandamus relief. And *second*, Defendants are not entitled to a stay because they cannot satisfy any of the relevant standards. For these reasons and to avoid undue confusion and disruption at the OSC, this Court should allow the district court to rule on a preliminary injunction in the normal course—as provided by the governing rules and statutory framework, and as warranted to again uphold orderly judicial process.

## CONCLUSION

Special Counsel Dellinger respectfully requests that the Court deny Defendants' emergency stay motion.

Respectfully submitted,

Kate L. Doniger*
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883
kdoniger@heckerfink.com

/s/ Joshua A. Matz

Joshua A. Matz, Bar No. 1045064
Jackson Erpenbach, Bar No. 1735493*
Benjamin Stern, Bar No. 90027569*
HECKER FINK LLP
1050 K Street NW
Suite 1040
Washington, DC 20001
(212) 763-0883
jmatz@heckerfink.com
jerpenbach@heckerfink.com
bstern@heckerfink.com

*Attorneys for Plaintiff-Appellee Hampton Dellinger*

*\*D.C. Circuit application pending*

DATED: February 13, 2025

24

## CERTIFICATE OF COMPLIANCE

This response complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,167 words. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirement of Fed. R. App. P. 32(a)(6) because this document has been prepared using Microsoft Word in 14-point Times New Roman, a proportionally spaced typeface.

Dated: February 13, 2025                              /s/ Joshua A. Matz

Joshua A. Matz
*Counsel for Plaintiff-Appellee Hampton Dellinger*

## CERTIFICATE OF SERVICE

I hereby certify that on February 13, 2025, I electronically filed the foregoing response brief with the Clerk for the United States Court of Appeals for the D.C. Circuit by using the CM/ECF system. A true and correct copy of this brief has been served via the Court's CM/ECF system on all counsel of record.

Dated: February 13, 2025

/s/ Joshua A. Matz

Joshua A. Matz
*Counsel for Plaintiff-Appellee Hampton Dellinger*

# EXHIBIT A

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **HAMPTON DELLINGER** <br> *in his personal capacity and* <br> *in his official capacity as* <br> *Special Counsel of the* <br> *Office of Special Counsel*, <br><br> Plaintiff, <br><br> v. <br><br> **SCOTT BESSENT** <br> *in his official capacity as* <br> *Secretary of the Treasury, et al.*, <br><br> Defendants. | Civil Action No. 25-0385 (ABJ) |

## <u>ORDER</u>

On Friday, February 7, 2025 at 7:21 p.m., plaintiff Dellinger was the Special Counsel in the Office of Special Counsel, having been nominated by a President and confirmed by the Senate. Compl. ¶ 30. That was the status quo. At 7:22 p.m., the White House informed him that his position was terminated without cause. Ex. A to Compl. [Dkt. # 1-1].

That action was contested. In a lawsuit filed on Monday, February 10, plaintiff maintained that it plainly violated an unambiguous provision of the United States Code that was enacted by Congress and signed into law by President George H.W. Bush: 5 U.S.C. § 1211(b). Compl. ¶¶ 20, 38–41. And on that day, this Court entered an administrative stay to restore the status quo existing before the contested action, that is, Dellinger's position as Special Counsel, for a very brief period of time – until midnight on February 13 – so that it could receive the benefit of the defendants' briefing before it ruled on plaintiff's pending motion seeking a temporary restraining order. *See* Minute Order (Feb. 10, 2025). Defendants appealed and moved for a stay of that unappealable order, but apparently, they did not comply with it. *See* Defs.' Notice of the President's Designation of Acting Special Counsel [Dkt. # 13]. Their appeal has since been dismissed for lack of jurisdiction. *See* Order, *Dellinger v. Bessent*, No. 25-5025 (D.C. Cir. Feb. 12, 2025).

On February 12 – ahead of its own schedule – the Court issued a temporary restraining order, again calling for the restoration of the duly appointed Special Counsel, i.e., the status quo, until it rules on the request for a preliminary injunction. *See* Order [Dkt. # 14]. In the same order, the Court set a prompt hearing date for the preliminary injunction, which is to be held on February 26, 2025. And again, defendants have moved for a stay while they appeal what is also an order of limited duration that is not subject to appeal.

Defendants' position is that the statutory restrictions on the Special Counsel's removal are unconstitutional. They are eager to have that issue heard and resolved by a higher court. They will have that opportunity in due course, but first, the issue has to be fully briefed in this Court, where the case is pending. There has to be a hearing, and this Court has to issue an appealable order. In the meantime, defendants must appreciate that moving for a stay is not the same thing as receiving a stay. Indeed, as the Order issued on February 12 observes, the defendants have not identified any harm to themselves or the public that could flow from the Special Counsel's continuing to perform his statutory duty to protect whistleblowers in the federal government on a non-partisan basis. Order at 25.

The Court respects the importance of the matter and the Article II powers and responsibilities defendants are seeking to vindicate, and that is precisely why full briefing and a hearing are required. It also respects the concerns underlying the very unique role the Office of Special Counsel was designed to play and the provisions Congress decided – after lengthy negotiations with the executive branch – were necessary to enable the Special Counsel to fulfill that role free of political interference. His situation may not be found comparable to that of a typical agency head who wields significant executive power to promulgate regulations or enforce the law.

The Court has acted and will continue to act with extreme expedition. It has alerted the parties to the fact that it is considering consolidation of the request for interim relief with consideration of the merits, but it gave the parties the courtesy of expressing their views on that issue by tomorrow instead of doing so *sua sponte*.

For all of these reasons, defendants' motion to stay the February 12, 2025 temporary restraining order is **DENIED**.

AMY BERMAN JACKSON
United States District Judge

DATE: February 13, 2025