# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

**No. 25-5028**                                    **September Term, 2024**

**1:25-cv-00385-ABJ**

**Filed On: February 15, 2025**

Hampton Dellinger, in his personal capacity
and in his official capacity as Special Counsel
of the Office of Special Counsel,

      Appellee

    v.

Scott Bessent, in his official capacity as
Secretary of the Treasury, et al.,

      Appellants

      **BEFORE:**    Katsas*, Childs, and Pan, Circuit Judges

**O R D E R**

Upon consideration of the emergency motion for stay and the opposition thereto, it is

**ORDERED** that this appeal be dismissed for lack of jurisdiction, the emergency motion for stay be dismissed as moot, and the alternative request for mandamus relief be denied.

This case comes before the court on the government's appeal of a temporary restraining order ("TRO") entered by the district court on February 12, 2025, and the government's request that we stay the TRO pending resolution of the appeal. The TRO mandates that Hampton Dellinger "continue to serve as the Special Counsel of the Office of Special Counsel," even though the President, acting through the Presidential Personnel Office, sought to remove Dellinger from that position on February 7, 2025. Order Granting TRO, _Dellinger v. Bessent_, 25-cv-385 (ABJ), at 26 (D.D.C. Feb. 12, 2025), ECF No. 14. The TRO is in place for only fourteen days, until February 26, 2025, when the district court will hold a hearing on Dellinger's motion for a preliminary injunction. If granted, a preliminary injunction would extend relief through the pendency of the case, _i.e._, until the case is resolved on the merits.

* A statement by Circuit Judge Katsas, dissenting from this order, is attached.

# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

**No. 25-5028**                                    **September Term, 2024**

Although a TRO ordinarily is not an appealable order, the government asks us to make an exception and hear its appeal because the TRO "works an extraordinary harm" and is set to last for fourteen days. Stay Mot. 8–9. Alternatively, the government requests that we construe its stay motion as a petition for a writ of mandamus and grant the petition, which would have the effect of reversing the TRO. The government filed its appeal and stay motion on the evening of February 12, 2025, and requested a ruling from this court within two days, by noon on February 14, 2025, so that the Acting Solicitor General "has the opportunity to seek expeditious review from the Supreme Court if this Court denies relief." *Id.* at 3.

The relief requested by the government is a sharp departure from established procedures that balance and protect the interests of litigants, and ensure the orderly consideration of cases before the district court and this court. Instead of entertaining an emergency appeal of a TRO, the normal course would be for us to wait for the district court to issue a ruling on the preliminary injunction, which would be immediately appealable. Indeed, many of the issues raised in the stay motion will be addressed by the district court at the preliminary-injunction hearing on February 26, 2025. The district court has promised to issue its preliminary-injunction ruling with "extreme expedition." Order Denying Stay Mot., *Dellinger v. Bessent*, No. 25-385 (ABJ), at 2 (D.D.C. Feb. 13, 2025), ECF No. 19. Moreover, that ruling will rest upon a more complete record for our review, and an appeal of the preliminary-injunction decision will not require us to act within the fourteen-day lifespan of a TRO, in a case that raises weighty constitutional issues.

Because it would be inconsistent with governing legal standards and ill-advised to hold that a TRO is appealable based solely on unsubstantiated claims of "extraordinary harm" for fourteen days, we decline to treat the TRO as an appealable injunction. Nor has the government established its entitlement to the extraordinary remedy of mandamus. We therefore dismiss the appeal, dismiss the stay motion as moot, and deny the petition for a writ of mandamus.

## I.

The Office of Special Counsel ("OSC") is an independent agency of the United States that "safeguard[s] employees . . . who 'blow the whistle' on illegal or improper official conduct." *Wren v. Merit Sys. Prot. Bd.*, 681 F.2d 867, 872 (D.C. Cir. 1982). Among other powers, the OSC investigates complaints of prohibited personnel practices by federal employers, assists in settlement or alternative dispute resolution, and can seek corrective action on behalf of an employee before the Merit Systems Protection Board. *See* 5 U.S.C. §§ 1212, 1214–15. The OSC is led by the Special

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

## No. 25-5028                              September Term, 2024

Counsel, who must be nominated by the President and confirmed by the Senate.  *See id*. § 1211.  Once confirmed, the Special Counsel serves a five-year term.  *Id.* § 1211(b).  By statutory mandate, "[t]he Special Counsel may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office."  *Id.*

On October 3, 2023, then-President Biden nominated Hampton Dellinger to be Special Counsel of OSC.  The Senate confirmed Dellinger, and he took office on March 6, 2024.  His five-year term expires in 2029.  But at 7:22 p.m. on February 7, 2025, Dellinger received an email from the Director of the Presidential Personnel Office, Sergio Gor.  The email stated:  "On behalf of President Donald J. Trump, I am writing to inform you that your position as Special Counsel of the US Office of Special Counsel is terminated, effective immediately.  Thank you for your service[.]"

On February 10, 2025, Dellinger filed a civil action in the district court against President Trump, Gor, the Director of the Office of Management and Budget, the Secretary of the Treasury, the Acting Special Counsel of OSC, and the Chief Operating Officer of OSC.  In relevant part, the complaint asserted that Dellinger's removal violated 5 U.S.C. § 1211(b) because his removal was not "for inefficiency, neglect of duty, or malfeasance in office."  He sought an order declaring that his removal was unlawful and that he remains Special Counsel and must be fully treated as such.  Dellinger also sought a TRO enjoining the defendants from removing him from his post pending further consideration of the merits.

That afternoon, the district court held a hearing to discuss whether a TRO should be entered.  To allow time for briefing and consideration of the TRO request, the district court issued a three-day "administrative stay" "to preserve the status quo" that existed before the White House sought to remove Dellinger.  Min. Order Issuing Admin. Stay, *Dellinger v. Bessent*, No. 25-385 (ABJ) (D.D.C. Feb. 10, 2025).  The administrative stay provided that "through midnight on February 13, 2025, plaintiff Hampton Dellinger shall continue to serve as the Special Counsel," and that "the defendants may not deny him access to the resources or materials of that office or recognize the authority of any other person as Special Counsel."  *Id.*

That evening, the government noticed an appeal of the district court's administrative stay.  The government then filed an emergency motion in this court, seeking to stay the administrative stay.  The government argued that this court had jurisdiction over the administrative-stay order because it was "in substance a temporary restraining order" that is "akin to [an] injunction[]," which is appealable under 28 U.S.C. § 1292(a)(1).  1st Stay Mot. 18–20.  The government also argued that if the court

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

**No. 25-5028**                                                    **September Term, 2024**

concluded that the administrative stay was not appealable, the court should treat the government's motion as a mandamus petition and grant it. *Id.*

During the pendency of the appeal of the administrative stay, on February 11, 2025, the President designated Doug Collins, the Secretary of Veterans Affairs, as Acting Special Counsel. Later that day, we dismissed the administrative-stay appeal for lack of jurisdiction because the government had not shown that the district court's minute order "had the effect of granting an injunction that is appealable under 28 U.S.C. § 1292(a)(1)." Order, *Dellinger v. Bessent*, No. 25-5025 (D.C. Cir. Feb. 11, 2025). We also ruled that the government had not demonstrated its entitlement to the extraordinary remedy of mandamus.

On February 12, 2025, the district court vacated the administrative stay and granted Dellinger's motion for a TRO. The TRO mandates that, until the district court rules on Dellinger's request for a preliminary injunction, "Dellinger shall continue to serve as Special Counsel" and "[d]efendants may not deny him access to the resources or materials of that office or recognize the authority of any other person as Special Counsel." Order Granting TRO 26. The district court scheduled a preliminary-injunction hearing for February 26, 2025, fourteen days later. Moreover, the district court directed the parties to inform the court whether it should "consolidate consideration of the request for a preliminary injunction with consideration of the merits" and whether further briefing was warranted. *Id.* at 27.

That night, the government noticed an appeal of the TRO and asked the district court to stay the TRO pending appeal. The district court denied the motion to stay. On February 13, 2025, the government filed an emergency motion in this court, asking us to stay the TRO pending appeal or, in the alternative, provide mandamus relief. In response, Dellinger argues that this court lacks jurisdiction over the TRO and that the government fails to support its request for mandamus relief.

# United States Court of Appeals
### For The District of Columbia Circuit
_____

**No. 25-5028**                                    **September Term, 2024**

II.

The crux of the case before the district court is whether the President had authority to remove Dellinger from his post as Special Counsel without any finding of "inefficiency, neglect of duty, or malfeasance in office," as required by 5 U.S.C. § 1211(b).  The outcome will turn on whether the statute's constraint on the President's removal power is constitutional:  The government contends that the law is unconstitutional and can have no effect, while Dellinger asserts that the statute does not violate the Constitution and he is entitled to its protections.  To determine the parties' rights and obligations for now, until that dispute is resolved, the district court is following procedures prescribed by the Federal Rules of Civil Procedure regarding the issuance of TROs and preliminary injunctions.

Rule 65 authorizes a district court to issue a TRO or a preliminary injunction to prevent irreparable injury and to preserve the status quo while the district court assesses the merits of a case.  *See Cobell v. Kempthorne*, 455 F.3d 301, 314 (D.C. Cir. 2006) ("The usual role of a preliminary injunction is to preserve the status quo pending the outcome of litigation." (cleaned up)); *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) (same); Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2951 (3d ed. June 2024 update) (observing that TROs are "designed to preserve the status quo until there is an opportunity to hold a hearing on the application for a preliminary injunction"); *see also* Fed. R. Civ. P. 65(a), (b).  As Justice Holmes explained, until the district court can determine how to proceed, "it ha[s] authority, from the necessity of the case, to make orders to preserve the existing conditions and the subject of the petition," as "the law contemplates the possibility of a decision either way, and therefore must provide for it." *United States v. Shipp*, 203 U.S. 563, 573 (1906) (Holmes, J.).

A TRO often is used to provide immediate relief upon the filing of a lawsuit and may be issued without notice to the adverse party.  *See* Fed. R. Civ. P. 65(b)(1).  But a TRO "expires at the time after entry — not to exceed 14 days — that the court sets, unless before that time the court, for good cause, extends it for a like period or the adverse party consents to a longer extension."  Fed. R. Civ. P. 65(b)(2).  Beyond the timeframe of a TRO, the district court may grant a preliminary injunction to provide relief that extends until the lawsuit is resolved.  The standard for obtaining either a TRO or a preliminary injunction is identical.  *See Gordon v. Holder*, 632 F.3d 722, 723–24 (D.C. Cir. 2011).  The party seeking such relief "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  The district court typically keeps a TRO in place only until it can hold a hearing on a request for a

# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

**No. 25-5028**                                    **September Term, 2024**

preliminary injunction and issue a ruling on the preliminary injunction. Such a hearing allows the court to apply the applicable legal standard with the benefit of briefing, evidence (if necessary), and oral argument. *See* Order Denying Stay Mot. 2 ("The Court respects the importance of the matter and the Article II powers and responsibilities defendants are seeking to vindicate, and that is precisely why full briefing and a hearing are required.").

Preliminary injunctions are appealable, but TROs generally are not. "Under 28 U.S.C. § 1291, our appellate jurisdiction generally extends only to the 'final decisions' of district courts." *Salazar ex rel. Salazar v. District of Columbia*, 671 F.3d 1258, 1261 (D.C. Cir. 2012). One "exception," *id.*, is found in 28 U.S.C. § 1292(a)(1), which authorizes a court of appeals to exercise jurisdiction over "[i]nterlocutory orders . . . granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions." That subsection allows parties to appeal a preliminary injunction, but "[t]here is no statutory provision for the appeal of a temporary restraining order." Wright & Miller, Fed. Prac. & Proc. Civ. § 2951 (3d ed. June 2024 update); *see also Adams v. Vance*, 570 F.2d 950, 953 (D.C. Cir. 1978) ("The grant of a temporary restraining order under Rule 65(b), Fed. R. Civ. P., is generally not appealable.").

Nevertheless, we have held that "the label attached to an order by the trial court is not decisive with regard to whether it falls under Rule 65(a) [as a preliminary injunction] or Rule 65(b) [as a TRO] and the appellate court will look to other factors to determine whether an appeal should be allowed.'" *Adams*, 570 F.2d at 953 (cleaned up). In *Adams*, we held that "[t]he order" under review "was in purpose and effect a mandatory injunction appealable under 28 U.S.C. § 1292(a)(1)" because "[i]t did not merely preserve the status quo pending further proceedings, but commanded an unprecedented action irreversibly altering the delicate diplomatic balance in the environmental arena." *Id.* We explained that "[w]hen an order directs action so potent with consequences so irretrievable, we provide an immediate appeal to protect the rights of the parties." *Id.* But the exception articulated in *Adams* establishes a "high threshold." *Native Vill. of Chenaga Bay v. Lujan*, No. 91-5042, 1991 WL 40471, at *1 (D.C. Cir. Mar. 8, 1991). As Judge Friendly observed, it is "the rare case" when denial of a TRO is effectively the denial of a preliminary injunction and thus appealable. *Hoh v. Pepsico, Inc.*, 491 F.2d 556, 559–60 (2d Cir. 1974) (Friendly, J.).

Whether the granting, denying, or dissolving of a TRO is appealable depends on whether the disputed order should be treated as a preliminary injunction, and in making that determination courts generally look to several factors. As particularly relevant to this case and discussed in more detail *infra*, courts consider whether the order had irreparable consequences that warrant immediate relief. *See, e.g.*, *Berrigan v. Sigler*,

# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

**No. 25-5028**                                          **September Term, 2024**

475 F.2d 918, 919 (D.C. Cir. 1973) ("While the denial of a temporary restraining order is normally not appealable, an exception is made where the denial serves for all practical purposes to render the cause of action moot or where appellant's rights will be irretrievably lost absent review."); *Env't Def. Fund, Inc. v. Ruckelshaus*, 439 F.2d 584, 590 n.8 (D.C. Cir. 1971) (observing that "[t]he denial of a temporary restraining order is appealable as a final decision under 28 U.S.C. § 1291 when it determines substantial rights of the parties which will be irreparably lost if review is delayed" (cleaned up)).

Courts also look to:  (1) whether the order will remain in force longer than the time permissible for a TRO under Rule 65(b), *see, e.g.*, *Sampson v. Murray*, 415 U.S. 61, 86 (1974) (endorsing view that "a temporary restraining order continued beyond the time permissible under Rule 65 must be treated as a preliminary injunction, and must conform to the standards applicable to preliminary injunctions"); (2) whether the district court entered the order after a contested hearing, akin to a hearing held on a motion for preliminary injunction, *see, e.g.*, *United States v. Hubbard*, 650 F.2d 293, 314 n.73 (D.C. Cir. 1980) (explaining that denial of TRO was "equatable to denial of a preliminary injunction" "because the denial came only after the Church was heard on the merits" (citing *Sampson*, 415 U.S. at 86–88)); and (3) whether the order foreclosed future action for injunctive relief, *see, e.g.*, *Belbacha v. Bush*, 520 F.3d 452, 455 (D.C. Cir. 2008) ("Although the district court characterized the relief [appellant] seeks as a 'temporary restraining order,' that court's order dismissing his motion 'effectively foreclose[s]' [appellant] 'from pursuing further interlocutory relief in the form of a preliminary injunction,' and is therefore 'tantamount to denial of a preliminary injunction,' appealable under 28 U.S.C. § 1292(a)(1)." (quoting *Levesque v. Maine*, 587 F.2d 78, 80 (1st Cir. 1978))).

# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

**No. 25-5028**                          **September Term, 2024**

### III.

The government bears the burden of showing that the TRO in this case functions as an appealable injunction. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (party asserting court's jurisdiction has the burden of establishing jurisdiction). Although a TRO is "generally not appealable," *Adams*, 570 F.2d at 953, the government claims that the instant TRO is, in fact, an injunction because: (1) the district court's "order works an extraordinary harm to the President's authority over the Executive Branch by reinstating the principal officer of a single-headed agency after the President's removal of the officer," Stay Mot. 8; and (2) "the district court has now considerably prolonged that harm by setting its TRO to last for 14 days, on top of the two-day duration of its 'administrative stay,'" *id.* at 9. We are unpersuaded that the cited reasons make the TRO appealable; and we decline to set a precedent that would enable litigants to file appeals of TROs based solely on unsubstantiated claims of "extraordinary harm" during the period that the TRO is in effect.

The relief requested by the government is itself extraordinary: The government asks us to resolve disputed issues that plainly have not been finally adjudicated by the district court. The litigation of Dellinger's motion for a preliminary injunction is ongoing in the court below, and that litigation raises issues that are overlapping, if not identical, to those that would be presented in an appeal of the TRO. Moreover, the district court has stated its intention to rule on the preliminary injunction with "extreme expedition," and any appeal of the TRO must be resolved before February 26, when the TRO expires (which presumably would render the appeal moot). If we ruled on an appeal of the TRO or the stay motion by February 26, our ruling would disrupt, if not render obsolete, the proceedings in the district court. For example, our ruling on the stay motion necessarily would include analysis of the parties' likelihood of success on the merits. *See Nken v. Holder*, 556 U.S. 418, 434 (2009) (standard for stay pending appeal); *see also* Dissent 7–10 (analyzing likelihood of success on the merits). It is unclear how the district court could make an independent ruling on the preliminary-injunction motion or the merits of the case if we prejudged such a significant issue in advance of the February 26 hearing. In short, a decision by this court to opine on substantial legal issues at this point in the litigation, before the district court has finished its work and issued a ruling on the preliminary injunction, would throw a monkey wrench into the district court proceedings. *See Salazar*, 671 F.3d at 1261 (although limiting appellate jurisdiction only to final decisions "necessarily delays the resolution of important legal questions, Congress has determined that such delay must be tolerated in order to avoid 'the debilitating effect on judicial administration' that would otherwise result from 'piecemeal appe[llate] disposition of what is, in practical consequence, but a single controversy'") (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 471 (1978));

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

**No. 25-5028**                                    **September Term, 2024**

*cf. In re Flynn*, 973 F.3d 74, 79 (D.C. Cir. 2020) (en banc) (noting in the mandamus context "[t]he interest in allowing the District Court to decide a pending motion in the first instance").

Granting a stay of the TRO under the present circumstances would set a problematic precedent. If we were to accept the proposition that a party's bare assertion of "extraordinary harm" for fourteen days can render a TRO appealable, many litigants subject to TROs would be encouraged to appeal them and to seek a stay. Fourteen days is a standard lifespan for a TRO, and any TRO, by its nature, grants emergency relief that is likely to do perceived harm to someone. Thus, at a time when emergency litigation is becoming more prevalent, we surely would be faced with a deluge of TRO appeals. And, like in this case, each of those appeals would be litigated at a breakneck pace to avoid mootness and to preserve the parties' ability to appeal our ruling to the Supreme Court before the fourteen-day clock ran out. We see no reason to incentivize more requests for two-day rulings when the appeal of preliminary injunctions in the normal course has heretofore been adequate to protect the interests of litigants, including the government, in the vast majority of cases.

The government and our dissenting colleague lean heavily on the importance of the constitutional dispute in this case, and the prospect of "extraordinary harm" to the Executive's Article II prerogatives if the Special Counsel post is not immediately filled by an individual of the President's choosing. But the interests asserted by the government will be vindicated on an expedited basis in the preliminary-injunction proceedings: In just two weeks, the district court might rule in favor of the government; and if it does not, the government can appeal any contrary ruling. Waiting two weeks to make arguments to the district court and then, potentially, to this court is not so prejudicial to the government's interests that we must rush to issue a ruling in two days, while scrambling the normal appellate process.

But even more fundamentally, the "extraordinary harm" argument adopted by the government and the dissent is analytically flawed because it presumes that the government is correct on the merits. The cited "extraordinary harm" is the incursion on the President's authority to remove executive-branch officials at will — but the legality of such constraints in 5 U.S.C. § 1211(b) is the very merits issue that has not yet been adjudicated by the district court. We cannot presume "extraordinary harm" without presuming that section 1211(b) is unconstitutional, and presuming the invalidity of a duly enacted statute is the opposite of what courts normally do. *See Rostker v. Goldberg*, 453 U.S. 57, 64 (1981) ("Whenever called upon to judge the constitutionality of an Act of Congress . . . the Court accords 'great weight to the decisions of

# United States Court of Appeals
### For The District of Columbia Circuit
_____

**No. 25-5028**                                    **September Term, 2024**

Congress.'" (quoting *Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 102 (1973)).

Our dissenting colleague deems the TRO "extraordinary" because it "directs the President to recognize and work with an agency head whom he has already removed." Dissent 4. That assertion declines to recognize the possibility that the removal may have been unlawful. Congress, a coequal branch of government, enacted section 1211(b), which was signed into law by President Carter. That statute explicitly states: "The Special Counsel may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. § 1211(b). There is no dispute that the President violated the statute by not making any finding of "inefficiency, neglect of duty, or malfeasance in office" before removing Dellinger. The district court granted the TRO only after it made a finding that Dellinger's argument that the statute is constitutional and binding is likely to succeed on the merits. *See* Order Granting TRO 8–16. The dissent nevertheless appears to take the position that any time the President merely alleges or argues that his Article II powers have been infringed, he is entitled to immediate appellate review. Dissent 5 ("Where a lower court allegedly impinges on the President's core Article II powers, immediate appellate review should be generally available."). And yet, none of the authorities cited by the government or the dissent hold that the rules of civil procedure and appellate jurisdiction are suspended when the President is included as a party to a lawsuit. *Cf. Fed. Open Mkt. Comm. of Fed. Rsrv. Sys. v. Merrill*, 443 U.S. 340, 356 (1979) ("The Federal Rules [of Civil Procedure], of course, are fully applicable to the United States as a party."). The question here is not whether the President is entitled to prompt review of his important constitutional arguments. Of course he is. The issue before us is whether his mere *claim* of extraordinary harm justifies this court's *immediate* review, which would essentially remove the legal issues from the district court's ambit before its proceedings have concluded.[1]

_____

[1] In addition, although the government does not raise this argument, the dissent suggests that the district court's TRO improperly enjoined the President himself. *See* Dissent 5–6 (citing *Mississippi v. Johnson*, 71 U.S. 475 (1866)). To be sure, "in general" a court may not "enjoin the President in the performance of his official duties." *Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992) (plurality opinion) (quoting *Johnson*, 71 U.S. at 501). But that principle is beside the point because a court can unquestionably review the legality of the President's action by enjoining the officers who would attempt to enforce the President's order. *See, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952). So, in this case, the TRO is properly read as not applying directly to the President but rather to the other defendants acting on his behalf.

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

**No. 25-5028**                                    **September Term, 2024**

Our dissenting colleague suggests that we should proceed with a premature review of the merits of this case because the district court "thoroughly addressed" the constitutional questions presented, which are "purely legal in nature." Dissent 2. But the district court has unequivocally stated that it has not yet completed its work and that the substantial issues raised by the government warrant briefing and a full hearing so that it may render its final judgment. *See* Order Denying Stay Mot. 2 ("There has to be a hearing, and this Court has to issue an appealable order . . . . The Court respects the importance of the matter and the Article II powers and responsibilities defendants are seeking to vindicate, and that is precisely why full briefing and a hearing are required."). "We are a court of review, not of first view." *New LifeCare Hosps. of N. Carolina, LLC v. Becerra*, 7 F.4th 1215, 1225 (D.C. Cir. 2021) (cleaned up). No matter how strong the merits arguments appear, our job is to wait to address them in the context of reviewing the district court's ruling on either an appealable preliminary injunction or a final judgment on the merits.

The government relies on *Adams* to argue that "the significance of the harm that a TRO poses" is a relevant factor in determining a TRO's appealability. Stay Mot. 8–9. That is true, but the harm that was at issue in *Adams* is readily distinguishable. In *Adams*, the International Whaling Commission, an international treaty body, banned Alaskan Native hunting of a certain species of whale, subject to the United States's objection. *See Adams*, 570 F.2d at 952. Four days before the deadline to object, plaintiffs, representing a group of Alaskan Natives asserting a right to hunt whales, sued the Secretary of State; and the district court issued a TRO ordering the Secretary to object. *Id.* We held that we had jurisdiction over the government's appeal. We explained that "the order was in purpose and effect a mandatory injunction appealable under 28 U.S.C. § 1292(a)(1)" because "[i]t did not merely preserve the status quo pending further proceedings, but commanded an unprecedented action irreversibly altering the delicate diplomatic balance in the environmental arena." *Id.* "When an order directs action so potent with consequences so irretrievable," we added, "we provide an immediate appeal to protect the rights of the parties." *Id.* at 953. We noted that the district court's order "was based on the unwarranted assumption that such objection would not harm the United States because the objection could be withdrawn" and that this "assumption . . . is an unwarranted intrusion on executive discretion in the field of foreign policy and agreements insofar as it represents a judgment." *Id.* at 952.

Unlike the court order in *Adams*, the district court's TRO maintains the status quo and does not command unprecedented action — to the contrary, Dellinger has served as Special Counsel for nearly a year. *See Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 732 (D.C. Cir. 2022) (noting that in the context of a preliminary injunction, "[t]he status quo is the last uncontested status which preceded the pending controversy" (cleaned

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**No. 25-5028**                                    *September Term, 2024*

up)).  Nor is the TRO irreversible.  It is in effect only until the preliminary-injunction hearing on February 26, 2025, at which point the district court can deny the preliminary injunction and allow the President to remove Dellinger, if the court so chooses. Moreover, the court order in *Adams* "direct[ed] action by the Secretary of State in foreign affairs," which "plainly" and "deeply" intruded into "the core concerns of the executive branch."  *Adams*, 570 F.2d at 954.  Here, by contrast, the asserted harm to the President's authority is disputed:  Whether the constraint on the President's removal authority imposed by section 1211(b) is constitutional is still to be litigated on the merits.

The government's remaining argument is that the TRO should be treated as a preliminary injunction because "the district court has now considerably prolonged [extraordinary] harm by setting its TRO to last for 14 days, on top of the two-day duration of its 'administrative stay.'"  Stay Mot. 9.  But the government fails to explain why the expiration date of the TRO converts the TRO into an injunction.  Rule 65(a) permits the district court to set the expiration date of a TRO and specifies that such an order may not "exceed 14 days" unless the court, "for good cause, extends it."  Fed. R. Civ. P. 65(b)(2).  The government does not argue that the TRO's fourteen-day period is longer than permitted by the Rule, but instead seems to suggest that the harm of keeping a Special Counsel in place against the President's wishes is so intolerable that the wrong must be corrected immediately.  Fourteen days is not a long time in the realm of litigation, and it is a standard period for a TRO to be in effect under Rule 65(b).  The government does not meet its burden to show why this factor weighs in favor of finding the TRO appealable.  In sum, the government fails to meet the "high threshold" for demonstrating that the district court's TRO should be treated as a preliminary injunction, subject to interlocutory appeal.  *See Native Vill. of Chenaga Bay*, 1991 WL 40471, at *1.[2]

### IV.

The Supreme Court noted in *Cheney* that, with respect to petitions involving the President or Vice President, "mandamus standards are broad enough to allow a court of appeals to prevent a lower court from interfering with a co-equal branch's ability to

_____

[2]  The government does not rely on any of the other considerations that courts have looked to in determining whether a TRO is appealable:  It has not argued that the TRO will foreclose future action for injunctive relief or that it is functionally a preliminary injunction because the district court issued it after a contested hearing.  *See Al-Tamimi v. Adelson*, 916 F.3d 1, 6 (D.C. Cir. 2019) ("A party forfeits an argument by failing to raise it in his opening brief.").

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

**No. 25-5028**                                          **September Term, 2024**

discharge its constitutional responsibilities." *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 382 (2004). Thus, a writ of mandamus is the most appropriate relief for the government to seek when asserting harms that implicate the separation of powers and executive authority. Yet, the government relegates mandamus to a secondary, alternative claim, arguing only that if the TRO is unappealable, we should "exercise [our] discretion to treat [the stay motion] as a petition for writ of mandamus." Stay Mot. 10. The government fails to meet the rigorous standard for mandamus relief.

As the Supreme Court has emphasized, a writ of mandamus "is a 'drastic and extraordinary' remedy 'reserved for really extraordinary causes.'" *Cheney*, 542 U.S. at 380 (quoting *Ex parte Fahey*, 332 U.S. 258, 259–60 (1947)). "'[T]he writ cannot be used to actually control the decision of the trial court,' because '[a]s an appellate court, we are a court of review, not of first view.'" *Flynn*, 973 F.3d at 78 (cleaned up) (first quoting *Bankers Life & Cas. Co. v. Holland*, 346 U.S. 379, 383 (1953); and then *Cutter v. Wilkinson*, 544 U.S. 709, 718 n.7 (2005)).

A court should issue a writ of mandamus "only if: (1) 'the party seeking issuance of the writ [has] no other adequate means to attain the relief he desires'; (2) 'the petitioner [satisfies] the burden of showing that his right to issuance of the writ is clear and indisputable'; and (3) 'the issuing court, in the exercise of its discretion, [is] satisfied that the writ is appropriate under the circumstances.'" *Flynn*, 973 F.3d at 78 (quoting *Cheney*, 542 U.S. at 380–81). When a case "implicates the separation of powers, the Court of Appeals must also ask, as part of this inquiry, whether the District Court's actions constituted an unwarranted impairment of another branch in the performance of its constitutional duties." *Cheney*, 542 U.S. at 390.

The government fails the *Cheney* test at every step. First, the government obviously has other adequate means to attain the relief it seeks — it can attempt to persuade the district court to deny the preliminary-injunction motion and allow the President to remove Dellinger during the pendency of the case; and if the government fails in that attempt, it is entitled to appeal the district court's ruling. *See* 28 U.S.C. § 1292(a)(1). As noted, the legal standard governing the issuance of preliminary injunctions is identical to that governing the entry of TROs. Thus, a premature appeal of the TRO ruling would unduly impinge on the district court's ability to resolve the preliminary-injunction motion that is presently before it. In *Flynn*, we noted that we were unaware of any precedent in which "our Court, or any court, issued the writ to compel a district court to decide an *undecided* motion *in a particular way* — *i.e.*, when the district court might yet decide the motion in that way on its own." *Flynn*, 973 F.3d at 79 (emphasis in original); *see also id.* at 82 ("Try as they might, neither Petitioner, nor the Government, nor the dissent has identified a single instance where any court of appeals

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

**No. 25-5028**                                          **September Term, 2024**

has granted the writ to decide a trial court motion without first giving the district court an opportunity to make a decision.").  Appellate review after the preliminary-injunction proceeding easily safeguards the government's interests here.  *See Roche v. Evaporated Milk Ass'n*, 319 U.S. 21, 27–28 (1943) ("Ordinarily mandamus may not be resorted to as a mode of review where a statutory method of appeal has been prescribed . . . .").

Moreover, "[w]hen ordinary appellate review (or even, as here, further proceedings before the District Court) remains available, the writ may not issue unless the petitioner 'identif[ies] some 'irreparable' injury that will go unredressed if he does not secure mandamus relief.'"  *Flynn*, 973 F.3d at 79 (quoting *In re al-Nashiri*, 791 F.3d 71, 79 (D.C. Cir. 2015)).  But the harm alleged by the government is not irreparable because, as previously discussed, the alleged harm is largely contingent on the government prevailing on the merits.

Second, the government has not met its burden to show that its entitlement to mandamus is clear and indisputable.  To meet this requirement, the petitioner must "point to 'cases in which a federal court has held that' relief is warranted 'in a matter involving like issues and comparable circumstances.'"  *In re Al Baluchi*, 952 F.3d 363, 369 (D.C. Cir. 2020) (quoting *Doe v. Exxon Mobil Corp.*, 473 F.3d 345, 355 (D.C. Cir. 2007)).  "Accordingly, we will deny mandamus even if a petitioner's argument, though 'pack[ing] substantial force,' is not clearly mandated by statutory authority or case law."  *Id.* (quoting *In re Khadr*, 823 F.3d 92, 99–100 (D.C. Cir. 2016)).  Indeed, we have recognized that open legal questions do not present a clear and indisputable right to mandamus relief.  *See Al-Nashiri*, 791 F.3d at 85–86.  Here, the government states only that "given the Supreme Court's recent decisions in *Collins v. Yellen*, 594 U.S. 220 (2021), and *Seila Law* [*LLC v. CFPB*, 591 U.S. 197 (2020)], the government's right to issuance of the writ is clear and indisputable."  Stay Mot. 10 (cleaned up).  But the cited cases do not hold that the President has unrestricted power to remove the Special Counsel.  Rather, they pertain to the removal of heads of other government agencies.  *Seila Law* specifically distinguishes the Office of Special Counsel in its analysis, *Seila Law*, 591 U.S. at 221, and *Collins* notes that the Court was "not comment[ing] on the constitutionality of" the removal restriction for the Office of Special Counsel,  *Collins*, 594 U.S. at 256 n.21  Although the government argues that *Collins* and *Seila Law* support its position in this case, Stay Mot. 11–21, Dellinger argues that those cases actually support his view, Opp'n to Stay Mot. 15–20.  Because the extent of the President's power to remove the Special Counsel is an open legal question, the government's right to mandamus is not clear and indisputable.

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

## No. 25-5028                                      September Term, 2024

Finally, a writ of mandamus is not appropriate under the circumstances presented.  This requirement calls for the court to exercise its discretion.  *See Cheney*, 542 U.S. at 381 ("[E]ven if the first two prerequisites have been met, the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances."); *Whitehouse v. Ill. Cent. R.R. Co.*, 349 U.S. 366, 373 (1955) ("[M]andamus is itself governed by equitable considerations and is to be granted only in the exercise of sound discretion.").  Here, granting the writ would undermine the established framework for litigating TROs and preliminary injunctions, short-circuit ongoing proceedings before the district court, and prejudice the orderly administration of justice.  It is therefore not appropriate to grant the writ.

Because none of the *Cheney* considerations are satisfied, we deny the petition for a writ of mandamus.

*\*\*\**

For the foregoing reasons, the appeal is dismissed for lack of jurisdiction, the emergency motion for a stay of the TRO is dismissed as moot, and the petition for a writ of mandamus is denied.

Pursuant to D.C. Circuit Rule 36, this disposition will not be published.  The Clerk is directed to withhold issuance of the mandate herein until seven days after resolution of any timely petition for rehearing or petition for rehearing en banc.  See Fed. R. App. P. 41(b); D.C. Cir. Rule 41.

### **Per Curiam**

**FOR THE COURT:**
Clifton B. Cislak, Clerk

BY:   /s/

Scott H. Atchue
Deputy Clerk

# United States Court of Appeals
### For The District of Columbia Circuit
_____

## No. 25-5028                    September Term, 2024

KATSAS, *Circuit Judge*, dissenting:  The President removed Hampton Dellinger from his position as Special Counsel, the sole head of a federal agency that wields executive power in prosecuting enforcement actions before the Merit Systems Protection Board.  The district court then ordered the President to recognize Dellinger as the agency head for two weeks.  Despite the limited duration of that order, I would stay it immediately.  As explained below, the President is immune from injunctions directing the performance of his official duties, and Article II of the Constitution grants him the power to remove agency heads.

I

On Friday, February 7, 2025, President Trump removed Hampton Dellinger from his position as Special Counsel.  On Monday, February 10, Dellinger sued the President, Secretary of the Treasury, Director of the Office of Personnel Management, and other executive-branch officials to challenge the removal decision.  Dellinger moved for a temporary restraining order reinstating him to his post.  That afternoon, before the government could file an opposition, the district court entered a brief administrative stay that reinstated Dellinger, required the defendants to provide him access to the resources and materials of his former Office, and prohibited the defendants from recognizing any other person as Special Counsel.

On Wednesday, February 12, after the government filed its opposition, the district court entered a TRO against all defendants extending the relief previously granted.  That is, the district court ordered the President, along with other senior executive-branch officials, to recognize Dellinger as Special Counsel.  It did so even though the President, pursuant to the Vacancies Reform Act, had already designated Doug Collins, the Secretary of Veterans Affairs, as Acting Special Counsel.  The court suggested that the President, in making this designation, had violated its pre-TRO stay order.  *See Dellinger v. Bessent*, No. 25-0385, 2025 WL 471022, at *14 n.8 (D.D.C. Feb. 12, 2025).

The district court extensively discussed the four factors governing the issuance of TROs and preliminary injunctions.  It found that Dellinger was likely to succeed on the merits of his challenge to the President's removal order, that Dellinger would suffer irreparable injury in the absence of an order immediately reinstating him, and that the balance of harms and the public interest favored an order reinstating him as Special Counsel and requiring the President to recognize him as such.  *See Dellinger*, 2025 WL 471022, at *4-13.  The court set a preliminary-injunction hearing for February 26, and it ordered the parties to weigh in on whether to (1) treat the TRO briefing as briefing on a preliminary-injunction motion and (2) consolidate the preliminary-injunction hearing with the merits.  *Id.* at *14.

# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**No. 25-5028**                                        **September Term, 2024**

The government immediately appealed and sought an emergency stay. In the meantime, the government requested consolidation in the district court, which Dellinger does not oppose. These positions presumably reflect that the questions presented, which the district court has thoroughly addressed, are purely legal in nature. And for that reason, they are fit for immediate review.

II

Congress established the Office of Special Counsel in the Civil Service Reform Act of 1978. Pub. L. No. 95-454, § 202, 92 Stat. 1111, 1121 (1978). The Office is headed by a single individual—the Special Counsel—who is appointed by the President and confirmed by the Senate. 5 U.S.C. § 1211(b). The Special Counsel serves a five-year term, and, under the statute's terms, may be removed "only for inefficiency, neglect of duty, or malfeasance in office." *Id.*

The Special Counsel has broad investigative and enforcement powers. He may "receive and investigate allegations of prohibited personnel practices" anywhere within the federal government. 5 U.S.C. §§ 1212(a)(2), 1214(a)(1)(A). The list of "prohibited personnel practices" is extensive. Among other things, it includes—for all past, current, or prospective federal employees—allegations of discrimination, unauthorized employment preferences, coerced political activity, retaliation for various protected activities, improper influence, deception, and obstruction. *See id.* § 2302(b); 5 C.F.R. § 1800.2(a). Additionally, the Special Counsel may investigate alleged violations of the Hatch Act, the Freedom of Information Act, the Uniformed Services Employment and Reemployment Rights Act, and more. *See* 5 U.S.C. § 1216(a); 5 C.F.R. § 1800.2(b). In certain circumstances, he may also "require an agency head to conduct an investigation and submit a written report." *See* 5 U.S.C. § 1213(a), (c)(2). To further his investigations, the Special Counsel may issue subpoenas, order depositions and interrogatories, examine witnesses under oath, and receive evidence. *Id.* § 1212(b). During an investigation, he must be given access to all relevant agency "records, data, reports, audits, reviews, documents, papers, recommendations, or other material," *id.* § 1212(b)(5)(A)(i), and he may "require" the agency to provide such materials, *id.* § 1212(b)(5)(A)(iii).

After investigating, the Special Counsel may bring enforcement actions before the MSPB. To protect employees harmed by prohibited personnel practices, he may seek "a stay of any personnel action" or other "corrective action." 5 U.S.C. §§ 1214(b)(1)(A)(i), 1214(b)(2)(B). And to discipline employees who allegedly have committed prohibited personnel practices or violated the other statutes within his investigatory jurisdiction, the Special Counsel may "file a complaint [with the MSPB] or

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

**No. 25-5028**                                    **September Term, 2024**

make recommendations for disciplinary action" to the Board, agency heads, or even the President. *See id.* §§ 1212(a)(2)(B), 1215(a), (b). The Special Counsel may seek sanctions including removal, debarment from federal employment, suspension, and civil penalties. *See id.* § 1215(a)(3).

Given these powers, our Court has labeled the Special Counsel a "prosecutor . . . of merit system abuses," who pursues "corrective action petitions" before the MSPB that are "comparable to criminal prosecutions designed to vindicate the public interest." *Frazier v. MSPB*, 672 F.2d 150, 163 (D.C. Cir. 1982) (cleaned up); *see also Barnhart v. Devine*, 771 F.2d 1515, 1520 (D.C. Cir. 1985) (Special Counsel is "prosecutorial arm" and MSPB is "adjudicatory apparatus"). The MSPB likewise has described the Special Counsel's relationship to it as like "that of a prosecuting attorney to a court." *Layser v. USDA*, 8 M.S.P.B. 72, 73 (1981).

III

Before addressing the government's request for a stay, I must consider this Court's jurisdiction over the underlying appeal. That question arises because the February 12 order is styled as a TRO and remains effective for only two weeks. As a general matter, TROs are not appealable. But in my view, *this* TRO—which orders the President to recognize the authority of an agency head whom he has formally removed—qualifies for immediate review.

A

Although orders granting preliminary injunctions are appealable, 28 U.S.C. § 1292(a)(1), TROs generally are not. *See Adams v. Vance*, 570 F.2d 950, 953 (D.C. Cir. 1978); 16 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3922.1 (3d ed.) (Wright & Miller). Courts have offered a practical justification for this rule: Because TROs are of "brief duration" and designed only "to preserve the opportunity to rule in orderly fashion upon a request for longer-lasting preliminary relief," they ordinarily do "not threaten irreparable injury." Wright & Miller, § 3922.1. But *some* TROs *do* threaten immediate irreparable injuries, no matter how short their duration. So, the rule against appealability is flexible; it gives way "on finding that in the circumstances of a particular case the need for immediate appeal overcomes the reasons for the general rule that appeal is not available." *Id.*; *see Ne. Ohio Coal. for Homeless & Serv. Emps. Int'l Union, Loc. 1199 v. Blackwell*, 467 F.3d 999, 1005 (6th Cir. 2006) (courts look "to the nature of the order and the substance of the proceeding below to determine whether the rationale for denying appeal applies"). For example, in *Adams*, to protect the Executive Branch from "irretrievable" consequences, this Court

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

**No. 25-5028**                              **September Term, 2024**

reviewed and reversed a TRO directing the Secretary of State to object to an international whaling ban just before an impending deadline.  *See* 570 F.2d at 953-57. In *Northeast Ohio Coalition*, the Sixth Circuit, to prevent "irretrievable harm on the State of Ohio," reviewed and reversed a TRO enjoining enforcement of its voter-identification law on the eve of an election.  467 F.3d at 1006.  And in *Hope v. Warden York County Prison*, 956 F.3d 156 (3d Cir. 2020), the Third Circuit, to prevent "irreversible" harm to a county in Eastern Pennsylvania, reviewed a TRO compelling state officials to immediately release certain immigration detainees because of the COVID pandemic. *Id.* at 160-62 (citing *Adams*, 570 F.2d at 953).

B

The extraordinary character of the order at issue here—which directs the President to recognize and work with an agency head whom he has already removed—warrants immediate appellate review.

When it comes to judicial review, courts have long recognized the "special status of the President."  *Chamber of Com. v. Reich*, 74 F.3d 1322, 1331 n.4 (D.C. Cir. 1996) (citations omitted).  While the President is not absolutely immune from judicial process, it is "obvious" that a court may not "proceed against the president as against an ordinary individual."  *United States v. Burr*, 25 F. Cas. 187, 192 (C.C.D. Va. 1807) (Marshall, C.J.).  Indeed, the prospect of judicial encroachment on presidential authority informs various facets of separation-of-powers jurisprudence.  For instance, the President enjoys unique evidentiary privileges, *United States v. Nixon*, 418 U.S. 683, 707-09 (1974); absolute immunity from damages suits for official acts, *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982); and at least presumptive immunity from criminal prosecution for official acts, *Trump v. United States*, 603 U.S. 593, 614 (2024).

Solicitude for the President also informs various doctrines regarding immediate appellate review.  For example, in *United States v. Nixon*, the Supreme Court held that an order compelling the President to produce subpoenaed documents in a pending criminal case was a "final" decision supporting an immediate appeal under 28 U.S.C. § 1291—even though any other party would have had to defy the order and go into contempt to obtain review.  *See* 418 U.S. at 690-92.  In *Cheney v. United States District Court for the District of Columbia*, 542 U.S. 367 (2004), the Supreme Court allowed the Vice President to seek immediate review of discovery orders entered against him in a pending civil case.  *Id.* at 378.  The Vice President alleged "substantial intrusions on the process by which those in closest operational proximity to the President advise the President."  *Id.* at 381 (cleaned up).  The Court agreed, explaining that the allegations "remove[d] this case from the category of ordinary discovery orders where interlocutory

Page 4

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

**No. 25-5028**                                                    **September Term, 2024**

---

appellate review is unavailable." *Id.* For petitions "involving the President or Vice President," it held that "mandamus standards are broad enough to allow a court of appeals to prevent a lower court from interfering with a coequal branch's ability to discharge its constitutional responsibilities." *Id.* at 382. And it vacated the discovery orders based on the same considerations. *See id.* at 383-92. Finally, even apart from any question of immunity, the President may immediately appeal any interlocutory order rejecting an as-applied defense under Article II of the Constitution to a criminal prosecution. *See Trump*, 603 U.S. at 654 (Barrett, J., concurring). These decisions reflect a common theme: Where a lower court allegedly impinges on the President's core Article II powers, immediate appellate review should be generally available. The balancing of interests to determine appealability under *Adams* is flexible enough to accommodate the same outcome here.

Immunity considerations reinforce this conclusion. When a district court denies a claim of presidential immunity, the President may seek immediate review, *see Trump*, 603 U.S. at 606; *Nixon v. Fitzgerald*, 457 U.S. at 741, just like any other official or sovereign seeking to vindicate an asserted litigation immunity, *see Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 142-47 (1993); *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). And the President enjoys absolute immunity from injunctive actions. In *Franklin v. Massachusetts*, 505 U.S. 788 (1992), the Supreme Court reiterated long-settled law that the federal courts have "no jurisdiction of a bill to enjoin the President in the performance of his official duties." *Id.* at 802-03 (plurality op.) (quoting *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1867)); *see also id.* at 827 (Scalia, J., concurring in part and concurring in the judgment) (same); *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) ("With regard to the President, courts do not have jurisdiction to enjoin him." (cleaned up)). *Franklin*, *Mississippi*, and *Newdow* all phrased the President's absolute protection from injunctive actions as a jurisdictional bar, but it is one that restrains the Judiciary in order to protect the President. So the jurisdictional bar must also reflect an immunity from litigation burdens, just like the President's protections from criminal prosecution and civil damages actions. And the immunity extends, at a minimum, to all official acts that are not "purely 'ministerial.'" *Franklin*, 505 U.S. at 802 (quoting *Mississippi*, 71 U.S. (4 Wall.) at 498-99); *see also id.* at 826 (Scalia, J., concurring in part and concurring in the judgment) ("I think it clear that no court has authority to direct the President to take an official act.").[1]

---

[1] I do not suggest that insubstantial assertions of immunity would trigger a right to immediate appellate review. They would not. *See Process & Indus. Devs., Ltd. v. Federal Republic of Nigeria*, 962 F.3d 576, 583 (D.C. Cir. 2020). Likewise, the *Adams* inquiry is flexible enough to exclude insubstantial assertions. But here, as explained

# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

**No. 25-5028**                    **September Term, 2024**

The order here is immediately reviewable under these principles. It purports to enjoin the President's removal of an agency head. Yet the "President's removal power serves vital purposes"; it "helps the President maintain a degree of control over the subordinates he needs to carry out his duties as the head of the Executive Branch, and it works to ensure that these subordinates serve the people effectively." *Collins v. Yellen*, 594 U.S. 220, 252 (2021). The removal power "is in no just sense ministerial," but instead "is purely executive and political." *Mississippi*, 71 U.S. at 499; *see In re Hennen*, 38 U.S. 230, 259-60 (1839). So the order ran afoul of *Mississippi v. Johnson*, and it usurped a core Article II power of the President. It is thus immediately appealable.[2]

C

Against all of this, Dellinger contends that we lack jurisdiction because the TRO merely preserves the status quo, defined as the last uncontested status just before the controversy arose. Our precedents do take that consideration into account, in assessing both irreparable injury, *see Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733-34 (D.C. Cir. 2022), and appealability, *see Adams*, 570 F.2d at 953. But it does not always carry the day. As explained above, TROs themselves sometimes inflict irreparable injury, and in those cases an immediate appeal is available to avoid it. For instance, the last uncontested status in *Northeast Ohio Coalition* was the world with no voter ID law, and the TRO at issue preserved that status. *See* 467 F.3d at 1006. Nonetheless, because the TRO unjustifiably inflicted irreparable harm on Ohio, the Sixth Circuit reviewed and reversed it. *See id.* The appealability inquiry thus ultimately turns less on trying to define the most relevant status quo, or trying to characterize the injunction as mandatory or prohibitory, than it does on a "weighing of relative hardships." Wright & Miller, § 3922.1; *cf. Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921, 930-31 (2024) (Kavanaugh, J., concurring) ("difficulties emerge when trying to define

_____

below, the asserted immunity is more than colorable.

    2 My colleagues seek to cure the *Mississippi v. Johnson* problem by excluding the President from the scope of the TRO. *Ante* at 10 n.1. But by its terms, the order expressly applies to all "Defendants." *See Dellinger*, 2025 WL 471022, at \*14. Moreover, the district court observed that the designation of Secretary Collins as the Acting Special Counsel—which only the President could do—"may have" violated the terms of its initial order. *Id.* at \*14 n.8. And the TRO necessarily targets the President—the only official with the statutory and constitutional authority to appoint, remove, and supervise the Special Counsel.

# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

**No. 25-5028**                                    **September Term, 2024**

the status quo," depending on whether the challenged conduct or the injunction of it is more injurious).  Here, though the two-week timeframe mitigates some harms on both sides of the balance, the weighing still tips decidedly in favor of the government.  As explained more fully below, the TRO unjustifiably intrudes into a core institutional prerogative of the President, while Dellinger's modest individual injury could be remedied in an action for backpay.

For these reasons, the TRO is immediately appealable.

IV

The government asks us to stay the TRO pending our resolution of the appeal. Four considerations are relevant: whether (1) the government has made a strong showing that it will prevail on appeal; (2) the government will be irreparably harmed absent a stay; (3) issuance of the stay will substantially harm Dellinger or others; and (4) the stay is in the public interest.  *Nken v. Holder*, 556 U.S. 418, 425-26 (2009) (citation omitted).  Applying these factors, I would grant a stay.

A

The government has shown a strong likelihood of success on the merits.  An injunction preventing the President from firing an agency head—and thus controlling how he performs his official duties—is virtually unheard of.  *See Franklin*, 505 U.S. at 827 (Scalia, J., concurring in part and concurring in the judgment) ("I am aware of only one instance in which we were specifically asked to issue an injunction requiring the President to take specified executive acts [and] we emphatically disclaimed the authority to do so").  And in any event, Article II of the Constitution empowers the President "to remove the head of an agency with a single top officer."  *Collins*, 594 U.S. at 256.

1

To begin with, Dellinger cannot overcome various barriers to injunctive relief here.  Most obviously, courts may not enjoin the President regarding the performance of his official acts, regarding removal or otherwise.  *See Franklin*, 505 U.S. at 802-03 (plurality); *id.* at 827 (Scalia, J., concurring in part and concurring in the judgment); *Mississippi*, 71 U.S. (4 Wall.) at 501; *Newdow*, 603 F.3d at 1013.  That is why removed executive officers traditionally have sought judicial review not through injunctive actions against the President for reinstatement, but through backpay actions for damages. *See, e.g., Weiner v. United States*, 357 U.S. 349, 349-51 (1958); *Humphrey's Ex'r v.*

Page 7

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

**No. 25-5028**                                    **September Term, 2024**

*United States*, 295 U.S. 602, 622 (1935); *Myers v. United States*, 272 U.S. 52, 106 (1926). Perhaps it is also why the parties have identified just a single, unpublished district-court decision purporting to enjoin the President from removing any government official from office. *See Berry v. Reagan*, No. 83-3182, 1983 WL 538 (D.D.C. Nov. 14, 1983). And even *Berry* was a far cry from this case: It involved members of the United States Commission on Civil Rights, a temporary, multi-member agency charged with making reports to the President and Congress. The Commission thus had no coercive power beyond the ability to issue subpoenas. *See id.* at *1. So while the *Berry* court wrongly enjoined the President, it at least did not impair his ability to remove—and therefore supervise—subordinates wielding his power to faithfully execute federal law.

Moreover, even when not directed against the President, injunctions in federal personnel matters are highly disfavored. *Sampson v. Murray*, 415 U.S. 61, 83-84 (1974). The Supreme Court has long warned that judicial interference in government hiring and firing "would lead to the utmost confusion in the management of executive affairs," *White v. Berry*, 171 U.S. 366, 378 (1898), like the ongoing judicial and executive dispute over who is currently Special Counsel, *see Dellinger*, 2025 WL 471022, at *14 n.8. Even when seeking an "orthodox" injunction regarding federal personnel matters, a plaintiff must make a rigorous showing that he is entitled to relief. *Sampson*, 415 U.S. at 84. And here, the relief Dellinger seeks—an injunction restricting the President's exercise of his "conclusive and preclusive constitutional authority" to remove officers, *Trump*, 603 U.S. at 608-09—is anything but "orthodox." To obtain any injunction that so "deeply intrudes into the core concerns of the executive branch," Dellinger must at a minimum "make an extraordinarily strong showing" that he deserves relief. *Adams*, 570 F.2d at 954-55. As explained below, he cannot.

2

The order at issue rests on statutory removal protections that violate Article II of the Constitution, which vests "[t]he executive [p]ower" in the President and charges him with the faithful execution of the laws. U.S. Const. Art. II, §§ 1, 3. As the Supreme Court has long recognized, these provisions confer upon the President the power to remove executive officers at will. *See, e.g., Collins*, 594 U.S. at 250-51; *Seila Law LLC v. CFPB*, 591 U.S. 207, 213-15 (2020); *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 492-93 (2010); *Myers*, 272 U.S. at 108-17.

The Supreme Court has recently clarified the scope of this removal power. Consistent with history and tradition, the President is constitutionally empowered to "remove the agents who wield executive power." *Seila Law*, 591 U.S. at 238; *see Free Enter. Fund*, 561 U.S. at 513-14 (President has "authority to remove those who assist

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

**No. 25-5028**                              **September Term, 2024**

him in carrying out his duties"). Congress may restrict that power only in "two limited exceptions." *Seila Law*, 591 U.S. at 228. The first exception, established in *Humphrey's Executor*, applies to officers who are part of a "multimember body of experts, balanced along partisan lines, that perform[s] legislative and judicial functions and [does not] exercise any executive power." *Id.* at 216. The second applies to "inferior officers with limited duties and no policymaking or administrative authority." *Id.* at 218. These two exceptions represent the "outermost constitutional limits of permissible congressional restrictions on the President's removal power." *Id.* (quoting *PHH Corp. v. CFPB*, 881 F.3d 75, 196 (D.C. Cir. 2018) (Kavanaugh, J., dissenting)). In recent decades, the Court has consistently declined to extend these exceptions or create new ones. *See Collins*, 594 U.S. at 250-51; *Seila Law*, 591 U.S. at 220; *Free Enter. Fund*, 561 U.S. at 483-84. And twice in the past five years, the Court has held that Congress may not exempt "an agency led by a single director" from the President's at-will removal power. *Collins*, 594 U.S. at 251; *Seila Law*, 591 U.S. at 204.

Under these rules, Congress cannot constitutionally restrict the President's power to remove the Special Counsel. *First*, the Special Counsel undoubtedly wields executive power. As described above, he may investigate all manner of prohibited personnel practices and other acts proscribed by specified federal statute. He may demand from other agencies any records related to one of his investigations. He may sometimes command other agency heads to conduct investigations. And most obviously, he may prosecute actions before the MSPB for various forms of corrective action or sanctions. Based on these powers, we repeatedly have recognized that the Special Counsel resembles an intra-governmental investigator and prosecutor. *See, e.g.*, *Barnhart*, 711 F.2d at 1525; *Frazier*, 672 F.2d at 163. And prosecutors indisputably wield core executive power. *Cmty. for Creative Non-Violence v. Pierce*, 786 F.2d 1199, 1201 (D.C. Cir. 1986).

*Second*, neither of the exceptions to the President's Article II removal power applies here. The Special Counsel is a single agency head, not a multimember commission, so the *Humphrey's Executor* exception does not apply. And the Special Counsel is not an inferior officer—one who is "directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." *United States v. Arthrex, Inc.*, 594 U.S. 1, 13 (2021); *see Edmond v. United States*, 520 U.S. 651, 663-65 (1997). As the sole head of an agency, he reports only to the President. And by statute, only the President may remove him. 5 U.S.C. § 1211.

The district court reasoned that *Seila Law* and *Collins* do not control because the Special Counsel exercises less executive power than the specific agency heads at

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**No. 25-5028**                                    **September Term, 2024**

issue in those cases.  Perhaps so, but both cases held that the President must be able to remove—and thus "maintain a degree of control over"—subordinates through whom he exercises his executive power.  *Collins*, 594 U.S. at 252; *see Seila Law*, 591 U.S. at 204 ("The President's power to remove—and thus supervise—those who wield executive power on his behalf follows from the text of Article II, was settled by the First Congress, and was confirmed in the landmark decision in *Myers* . . . .").  And although the Court described the Special Counsel's jurisdiction as more "limited" than that of the CFPB, it also noted that the Office of Special Counsel is a relatively new creation whose constitutionality has been questioned since its inception.  *See Seila Law*, 591 U.S. at 221.  In any event, one year later, *Collins* held that the constitutionality of a removal restriction does not "hinge[]" on "the relative importance of the regulatory and enforcement authority of disparate agencies" that wield executive power.  *See* 594 U.S. at 251-53.  Thus, the Special Counsel's relatively limited executive functions do not distinguish *Seila Law* or *Collins*.

## B

The remaining factors also counsel in favor of a stay.

*Irreparable Injury.*  The injunction directs the President to recognize and work with an agency head whom he has already removed.  In so doing, it impinges on the "conclusive and preclusive" power through which the President controls the Executive Branch that he is responsible for supervising.  *Trump*, 603 U.S. at 608-09; *see also* The Federalist No. 70, at 424 (A. Hamilton) (C. Rossiter ed. 1961) (presidential supervision of the Executive Branch ensures "a due dependence on the people" and "a due responsibility" to them).  If the district court had enjoined the removal of the Secretary of State, the grave and irreparable character of injury to the President would be apparent.  *Cf. Adams*, 570 F.2d at 954 (stating that even "directing action by the Secretary of State in foreign affairs" constitutes an irreversible "intrusion" on "the core concerns of the executive branch").  And while the Special Counsel may be less prominent than the Secretary of State, that difference goes to the extent—not the character—of the President's injury.  So too does the order's brief, two-week duration, which mitigates the extent—not the character—of harms to both the President and Dellinger.

In a much less fraught context, the Supreme Court in *Sampson* stressed the harm to the government from court-ordered reinstatement of terminated government employees.  The Court held that a district court, in considering any such order, "is bound to give serious weight to the obviously disruptive effect" that a grant of even "temporary relief" would be "likely to have" on the government's management of its internal affairs.  415 U.S. at 83.  And that case merely involved a probationary analyst in

# United States Court of Appeals
## For The District of Columbia Circuit
_____

**No. 25-5028**                                    **September Term, 2024**

the General Services Administration's Public Buildings Service. *Id.* at 62. If ordering the reinstatement of that employee harmed the government enough to raise an eyebrow, how much more concerning is an order preventing the President from removing, and compelling the President to supervise, an unwanted principal officer?

Finally, given the clarity of *Seila Law* and *Collins* on the constitutional question, the district court's injunction will likely expose the Office of Special Counsel to uncertainty and litigation. Individuals prosecuted by Dellinger in the MSPB inevitably will claim that because he now "lack[s] constitutional authority" to serve as the Special Counsel, his current governmental acts are "void ab initio." *Collins*, 594 U.S. at 257. Even if the OSC ultimately prevails on those issues, the claims will create risk and distraction. And if it does not, every action taken by the Special Counsel during the pendency of the district court's TRO could be vulnerable to legal challenge. While my colleagues correctly note that fourteen days is relatively brief "in the realm of litigation," *ante* at 12, the same cannot be said for the Executive Branch, *see, e.g.*, *Seila Law*, 591 U.S. at 223-25; The Federalist No. 70 (A. Hamilton) (discussing the need for an energetic Executive).

*Injury to Dellinger and others.* Granting a stay would not substantially harm Dellinger. In *Sampson*, the Supreme Court held that removal from federal office does not warrant injunctive relief so long as statutory backpay remedies are available. 415 U.S. at 90-92. Here, the Back Pay Act would provide Dellinger a remedy in the unlikely event that his challenge were to succeed on the merits. An officer is eligible for back pay if he was (1) a civil service officer appointed by the President, (2) engaged in performing a federal function authorized by law, and (3) subject to supervision by the President. 5 U.S.C. § 2105(a); *see Lambert v. United States*, 4 Cl. Ct. 303, 305 (1984), aff'd, 746 F.2d 1490 (Fed. Cir. 1984). Dellinger checks all three boxes. First, he was a presidential appointee, and the "civil service" includes all appointive positions in the Executive Branch except for the uniformed service. *See* 5 U.S.C. § 2101(1). Second, he was engaged in federal statutory functions. Third, like all principal officers, he was subject to presidential supervision. Because Dellinger would qualify for backpay if he were to prevail on the merits, he is disqualified from preliminary injunctive relief.

The district court focused on Dellinger's asserted statutory entitlement to serve out his term, regardless of any compensation. But with scant likelihood of success, it does not count for much. Moreover, the district court derived that asserted harm from the unpublished *Berry* decision, which reasoned that the plaintiffs' "deprivation of their statutory right to function as Commissioners" would cause *institutional* injury in the form of disrupting proceedings of the Civil Rights Commission. *See* 1983 WL 538, at *5. But in *Berry*, the challenged removals deprived the Commission of a quorum and thus

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

**No. 25-5028**                              **September Term, 2024**

disabled it from functioning at all.  *Id.*  Here, in contrast, Dellinger's removal created a single vacancy, and the President immediately designated an Acting Special Counsel, as allowed by the Vacancies Reform Act, until a successor could be nominated, confirmed, and appointed.  There is no reason to think that routine succession would tend to destabilize the OSC.  To the contrary, turnover among agency heads is routine.  And over the last few decades, Executive Departments have had almost as many acting heads as they have Senate-confirmed ones.  O'Connell, *Actings*, 120 Colum. L. Rev. 613, 642 (2020).

    *Public Interest.*  A stay is also in the public interest.  "Only the President (along with the Vice President) is elected by the entire Nation."  *Seila Law*, 591 U.S. at 224.  So, only through the President can the Executive Branch and its millions of personnel be held democratically accountable.  Allowing another branch of government to insulate executive officers from presidential control—whether by congressional statute or judicial injunction—would sever a key constitutional link between the People and their government.

V

    For these reasons, I would grant the government's stay motion.  As my colleagues dismiss the appeal for lack of jurisdiction, I respectfully dissent.